# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-01209-STV

ZAIN AGUILERA-VALDEZ,

     Plaintiff,

v.

TROY DAVENPORT,
NICK GRADISAR,
STEPHEN JESIK,
NIKKI THOMAS,
OFFICERS DOE 1–4,
CHRIS FLORES, and
FOUR UNKNOWN DETECTIVES,
     Defendants.

_____

# ORDER
_____

Entered By Chief Magistrate Judge Scott T. Varholak

     This matter comes before the Court on Defendants' Motion for Summary Judgment (the "Motion"). [#146] The parties have consented to proceed before the undersigned United States Magistrate Judge for all proceedings, including entry of a final judgment. [##54, 55, 80] This Court has carefully considered the Motion and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motion. For the following reasons, the Court **GRANTS** the Motion with respect to Plaintiff's federal claims and **DECLINES** supplemental jurisdiction over Plaintiff's state claims.

I.     **BACKGROUND**[1]

On July 18, 2020, Plaintiff drove his white Lexus with red rims to a Safeway store's parking lot to attend a car meet.  [#151-1, SOF1]  Shortly after Plaintiff's arrival, gunfire broke out and Plaintiff was shot in the lower right leg.  [*Id.* at SOF2]  After being shot, Plaintiff returned to his vehicle and drove away.  [*Id.* at SOF5]  He parked at an undisclosed parking complex and called his father, Mario Valdez.  [*Id.*]  Mr. Valdez met Plaintiff at the apartment complex and transported him to the Parkview Hospital Emergency Room.  [*Id.* at SOF6]

Witnesses at the scene reported to police that the gunfire occurred after at least three men—Domingo Jaramillo, David Sansoni, and at least one unidentified individual—attempted to rob people in the parking lot.  [*Id.* at SOF3; ##146-4 at 2; 146-5 at 2[2]]  One of the victims of the robbery, Felipe Michael Quintana, retrieved a handgun from his vehicle and shot and killed Jaramillo and Sansoni.  [*Id.* at SOF4]  Quintana and other witnesses reported that Jaramillo and Sansoni had robbed Quintana at gunpoint.  [*Id.*]

At 12:33 a.m., information was broadcast to detectives and officers that the 18th Street Gang was involved in the shooting.  [*Id.* at SOF7]  At 12:34 a.m., information was

---

[1] The undisputed facts are drawn from the Separate Statement of Facts filed with Defendant's reply in support of the Motion.  [#151-1]  The Court refers to the sequentially numbered facts set forth in the Statement of Facts as "SOF#."  The Court periodically cites directly to the exhibits cited by the parties in the Statement of Facts to provide additional context.

[2] Though this fact is listed by the parties as being undisputed, Plaintiff appears to dispute the timing of the officers' knowledge of the robbery, stating "[t]his only became apparent after INTERVIEW WITH AUSTIN MCGINNIS, that ended at 2:52."  [#150 at 9]  But the police reports clearly indicate that dispatch received information that "a male tried to rob someone at gun point," prompting officers to respond to the scene, where witnesses confirmed the robbery had occurred. [##146-4 at 2; 146-5 at 2] Plaintiff has not offered any evidence to contradict that fact.

broadcast by the units on the scene that the suspect was wearing jeans and a black shirt. [*Id.* at SOF8]  At 12:37 a.m., information was broadcast that the suspect had arrived at the parking lot in a white Lexus with red rims.  [*Id.* at SOF9]

At approximately 1:02 a.m., Defendant Sergeant Nikki Thomas, who was dispatched to investigate Plaintiff's gunshot wound, arrived at the hospital.  [*Id.* at SOF 11]  When Sergeant Thomas arrived at the hospital, Plaintiff was wearing blue jeans.  [*Id.* at SOF12]  He was not wearing a shirt so some of his tattoos were exposed and visible. [*Id.*]  Plaintiff explained to Sergeant Thomas that he took off his shirt because "it got hot." [*Id.* at SOF13]

At 1:06 a.m., Plaintiff told Sergeant Thomas that he was at the car meet with his little cousin and his uncle.  [*Id.* at SOF14]  Sergeant Thomas asked Plaintiff for his uncle's identity and Plaintiff responded: "What is his name?  Mingo?" [*Id.*]  Mr. Valdez then stated: "I don't know his real name.  All I know is Mingo.  That's it." [*Id.*]  Plaintiff then stated that his uncle's name is Mingo, but he does not know his real name.  [*Id.*]  Shortly thereafter, Sergeant Thomas asked Plaintiff whether he had seen a white car with red rims and Plaintiff responded that he did not know and was not paying attention.  [*Id.* at SOF17] Approximately twenty minutes later, while still in the hospital room, Plaintiff told Sergeant Thomas that he thought his uncle was one of the homicide victims.  [*Id.* at SOF15] Sergeant Thomas again asked Plaintiff for his uncle's last name and Mr. Valdez told her his last name was Jaramillo.  [*Id.* at SOF16]

At 1:45 a.m., Sergeant Thomas told Plaintiff that she and the nurse were going to take some photos of his face, chest, arms, and legs to "eliminate any other injuries."  [*Id.* at SOF18]  Plaintiff nodded his head and did not object to the photos, but he disputes that

he had the choice to refuse the photos. [*Id.* at SOF18, SOF19] Medical staff then removed Plaintiff's shirt so that Sergeant Thomas could photograph Plaintiff's tattoos.[3] [*Id.* at SOF12, SOF20] Approximately two minutes later, the Pueblo Police Department Event Log recorded a 2008 Lexus as being registered to Plaintiff, though it is not clear whether that information was ever conveyed to Sergeant Thomas. [*Id.* at SOF10]

While Plaintiff was at the hospital, Sergeant Thomas informed Plaintiff and his parents on multiple occasions that Plaintiff was a witness, not a suspect. [*Id.* at SOF21] Plaintiff also informed medical personnel that Plaintiff was a witness, not a suspect. [*Id.* at SOF22] Nonetheless, at 2:18 a.m., Sergeant Thomas told Plaintiff's parents that Plaintiff needed to go to the police station, that his parents could take him there, or the police could transport Plaintiff. [*Id.* at SOF24] When Plaintiff's mother asked why Plaintiff needed to go to the police station, Sergeant Thomas responded: "We are going to be questioning him. This is a double homicide, and he was there, and all of the witnesses are down at the station." [*Id.*] Plaintiff's mother told Sergeant Thomas that Plaintiff was not to be questioned without a lawyer. [*Id.*]

At 3:00 a.m., Plaintiff was discharged from the hospital. [*Id.* at SOF23] Sergeant Thomas again told Mr. Valdez that Plaintiff was a witness, not a suspect. [*Id.*] Sergeant Thomas permitted Plaintiff to ride with his parents to the police station after his discharge. [*Id.* at SOF25] At 3:09 a.m., Sergeant Thomas received a call from Defendant Detective Sergeant Chris Flores directing Sergeant Thomas to detain Plaintiff on suspicion of

---

[3] Between the time that Sergeant Thomas arrived and the time that medical staff removed Plaintiff's shirt for the photos, a nurse had placed a shirt on Plaintiff. [*Id.* at SOF12]

robbery.  [*Id.* at SOF26]  Minutes later, Plaintiff arrived at the police station where he was photographed by Defendant Sergeant Stephen Jesik.  [*Id.* at SOF27]

At approximately 6:36 a.m., officers attempted to question Plaintiff.  [*Id.* at SOF28] Officers advised Plaintiff of his *Miranda* rights, and he declined to answer questions.  [*Id.*] Plaintiff signed an Adult Miranda Advisement stating that he did not wish to talk to police officers and officers left the room.  [*Id.*]  Plaintiff was released from police custody between 10:00 a.m. and 10:30 a.m.  [*Id.* at SOF29]

Plaintiff initiated this action on April 30, 2021.  [#1]  On August 31, 2023, this Court issued an order on two motions to dismiss that had been filed.  [#125]  As a result of that order, the following claims remain: (1) a Fourth Amendment unlawful seizure related to Plaintiff's detention on July 18, 2020, (2) a Fourth Amendment unlawful search based upon Sergeant Thomas's removal of Plaintiff's shirt and photographing Plaintiff's tattoos at the hospital, (3) a Fourth Amendment unlawful search based upon an alleged swab of Plaintiff's hands for gunpowder residue, fingerprinting Plaintiff, and removing Plaintiff's shirt to photograph Plaintiff's tattoos at the police station, and (4) a Colorado Enhance Law Enforcement Integrity Act ("ELEIA") claim based upon these same three alleged Fourth Amendment violations.  [*Id.*]

On October 24, 2024, Defendants filed the instant Motion.  [#146]  The Motion seeks summary judgment on all of Plaintiff's remaining claims.  [*Id.*]  Plaintiff has responded to the Motion [#150] and Defendants have replied [#151].

## II.   STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

5

of law."   Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994).   If the moving party bears the burden of proof at trial, "the moving party must establish, as a matter of law, all essential elements of the [claim or defense upon which summary judgment is sought] before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."   *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). In other words, the moving party "must support its motion with credible evidence showing that, if uncontroverted, the moving party would be entitled to a directed verdict."   *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL 5728770, at *3 (D. Colo. Sept. 30, 2015) (citing *Celotex Corp.*, 477 U.S. at 331).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"   *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).   Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury.   *See Anderson*, 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).   Evidence, including testimony, offered in support of or in opposition to a motion for summary judgment must be based on more than mere speculation, conjecture, or surmise.   *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).   A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable juror could return a verdict for either party.   *Anderson*, 477 U.S. at 248.   "Where the record taken as

6

a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).  In reviewing a motion for summary judgment, the Court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the non-moving party."  *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).

## III.    ANALYSIS

Defendants make several arguments in support of their Motion.  First, they argue that Defendants Gradisar and Davenport should be dismissed because they did not personally participate in the alleged constitutional violations.  [#146 at 6-8]  Next, they argue that Defendants Thomas, Jesik, and Flores are entitled to qualified immunity on Plaintiff's Section 1983 claims.  [*Id.* at 8-19]  Finally, Defendants argue that they are entitled to summary judgment on Plaintiffs' ELEIA claims because Plaintiff has failed to allege a violation of his constitutional rights.  [*Id.* at 20]  The Court addresses each argument in turn.

### A.    Personal Participation

Defendants Gradisar and Davenport argue that they should be dismissed because they did not personally participate in the alleged constitutional violations.  [#146 at 6-8] "Section 1983 provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' by any person acting under color of state law."  *Pierce v. Gilchrist*, 359 F.3d 1279, 1285 (10th Cir. 2004) (quoting 42 U.S.C. § 1983).  The Tenth Circuit has made clear that "[p]ersonal participation is an essential allegation in a [Section 1983] claim."  *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th

7

Cir. 1976). Thus, to succeed on a Section 1983 claim against Defendants Gradisar and Davenport in their individual capacities, Plaintiff must present evidence of their "direct personal responsibility for the claimed deprivation of a constitutional right." *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006).

Plaintiff argues that, on July 18, 2020, Defendant Gradisar was the Mayor of Pueblo and Defendant Davenport was the Chief of Police. But the mere fact that a defendant is a supervisor is insufficient to establish the personal participation necessary for a Section 1983 claim. *Dodds v. Richardson*, 614 F.3d 1185, 1194-99 (10th Cir. 2010). Rather, to assert a supervisory liability claim, the plaintiff must allege "an affirmative link between the constitutional deprivation and the supervisor's personal participation, exercise of control, or his failure to supervise." *Bertolo v. Benezee*, 601 F. App'x 636, 639 (10th Cir. 2015) (citing *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008)).

Plaintiff's response asserts that he is pursuing a failure to train theory of liability. [#150 at 2] Under such a theory, a supervisor's personal liability may "be shown by a complete failure to train or such reckless or grossly negligent training that makes misconduct nearly inevitable." *Est. of Jensen by Jensen v. Clyde*, 989 F.3d 848, 858 (10th Cir. 2021) (quotation omitted). Here, Plaintiff has not identified, in any way, training deficiencies within the Pueblo Police Department, let alone how those training deficiencies made the actions on July 18, 2020, nearly inevitable. *Irizarry v. City and Cnty. Of Denver*, 661 F. Supp. 3d 1073, 1095 (D. Colo. 2023) (dismissing at the motion to dismiss stage a municipal liability failure-to-train claim where the complaint did not allege how the officer was trained, who trained him, how the training was deficient, or how the incident could have been avoided with better training).

8

Instead, Plaintiff cites three instances involving lawsuits related to the Pueblo Police Department.  [#150 at 2-4]  The first instance was a settlement related to an unlawful dynamic entry where, in late summer 2000, officers entered a home, subdued the family at gunpoint, and then searched a teenager and detained the teenager for two days without parental contact.  [*Id.* at 2-3]  The second instance involved allegations made in a 2020 lawsuit that Pueblo officers used excessive force against an individual.  [*Id.* at 3-4; *see also Guerrero v. City of Pueblo*, No. 20-cv-00810-KMT, Doc. No. 1 (D. Colo. 2020)]  The final instance involved an alleged settlement related to a Pueblo officer detaining someone for filming police activity in 2018.  [#150 at 4-5]

These three incidents are insufficient to create a genuine issue of material fact regarding deficient training leading to the July 18 incident.  Only the first incident, which occurred twenty years before the incidents in this case, involved an allegedly illegal search.  The excessive force incident had nothing to do with searches or detention and thus in no way suggests that the Pueblo Police Department's training was deficient with respect to searches and detentions related to a double homicide investigation.  And while the third incident involved an allegedly unlawful detention, the detention involved filming police activity and was entirely dissimilar to the facts of this case.  *Cf. Hernandez v. City & Cnty. of Denver*, No. 21-cv-01538-PAB-MEH, 2022 WL 3597452, at *5 (D. Colo. Aug. 23, 2022) (collecting cases for the proposition that "dissimilar incidents [cannot] support [a] municipal liability claim because they cannot establish a pattern of sufficiently similar constitutional violations").  And regardless, three dissimilar incidents over the span of more than two decades does not support a claim for individual supervisory liability.  *Cf. Sexton v. City of Colo. Springs*, 530 F. Supp. 3d 1044, 1071 (D. Colo. 2021) (in context

of a municipal liability claim, collecting cases for the proposition that one to three similar prior instances of constitutional violations did not establish a widespread custom or practice); *Abila v. Funk,* No. CIV 14-1002 JB/SMV, 2016 WL 9021834, at *19 (D.N.M. Dec. 14, 2016) (in context of a municipal liability claim, citing cases in support of the statement that "two or three instances will not suffice" to establish a practice or custom).[4]

Accordingly, the Court GRANTS the Motion to the extent it seeks summary judgment in favor of Defendants Gradisar and Davenport on Plaintiff's Section 1983 claims.

### B.    Qualified Immunity

Next, Defendants argue that Defendants Thomas, Jesik, and Flores are entitled to qualified immunity on Plaintiff's Section 1983 claims.  [*Id.* at 8-19]  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted).  Once the defense of qualified immunity has been raised, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'"  *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity."  *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001).

---

[4] In any event, as detailed below, the undisputed evidence shows that Plaintiff's constitutional rights were not violated.  For this additional reason, Defendants Gradisar and Davenport are entitled to summary judgment in their favor.

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent" such that it is "settled law." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity." *Id.* at 591 n.8. The Tenth Circuit, however, has stated that "[o]rdinarily this standard requires either that there is a Supreme Court or Tenth Circuit decision on point, or that the 'clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains.'" *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (quoting *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011)).

The Tenth Circuit has explained the "clearly established" prong of the qualified immunity analysis as follows:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate. The dispositive question is whether the violative nature of the *particular conduct* is clearly established. . . . Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (quotations and citations omitted). The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Wesby*, 138 S. Ct. at 590 (quotation omitted).

In analyzing the claims and defenses in this case, the Court must first determine if and when Defendants obtained probable cause to believe Plaintiff had committed an offense, thereby justifying Plaintiff's detention. "A warrantless arrest is [constitutionally]

permissible when an officer has probable cause to believe that the arrestee committed a crime." *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1256 (10th Cir. 1998). "Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested."[5] *United States v. Alonso*, 790 F.2d 1489, 1496 (10th Cir. 1986). The determination of probable cause is based upon "the totality of the circumstances," *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007), and "the reasonable conclusions that could have been drawn based on the facts known to the officer at the time of the arrest," *Spalsbury v. Sisson*, 250 F. App'x 238, 245 (10th Cir. 2007). "Neither the officer's subjective beliefs nor information gleaned post-hoc bear on [the probable cause] inquiry." *A.M. v. Holmes*, 830 F.3d 1123, 1139 (10th Cir. 2016) (quotation omitted).

As relevant here, Sergeant Thomas arrived at the hospital at 1:02 a.m. [#151-1, SOF11] But, between her arrival and 1:45 a.m., there is no indication that Plaintiff was detained by Sergeant Thomas. And, with respect to the remaining claims in the case, Sergeant Thomas did not engage in any searches until approximately 1:45 a.m., at which point she had Plaintiff's shirt removed and photographed his tattoos. [*Id.* at SOF18] Thus,

---

[5] Where, as here, an officer has asserted the defense of qualified immunity, "a section 1983 plaintiff [must] show that it would have been clear to a reasonable officer that probable cause was lacking under the circumstances." *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012) (internal quotation omitted). The Tenth Circuit has "implement[ed] this standard by asking whether there was 'arguable probable cause' for an arrest." *Id.*

the Court must determine whether Sergeant Thomas had probable cause to seize or search Plaintiff by 1:45 a.m.[6]

By 1:45 a.m., Sergeant Thomas knew the following: (1) two people had been shot and killed at the car meet [#151-1, SOF4]; (2) those two people and at least one unidentified individual had attempted to commit a robbery at the car meet [*id.* at SOF3; ##146-4 at 2; 146-5 at 2]; (3) the unidentified individual was wearing jeans and a black shirt [#151-1, SOF8]; (4) Plaintiff had been at the car meet and been shot [*id.* at SOF2, SOF14]; (5) Plaintiff was wearing jeans at the hospital [*id.* at SOF12]; (6) Plaintiff was not wearing a shirt purportedly because he was hot [*id.* at SOF12, SOF13]; (7) Plaintiff stated that he was at the car meet with his uncle but, initially, could only give his uncle's nickname [*id.* at SOF14]; and (8) after initially only being able to give a nickname for his uncle, Plaintiff stated that he believed his uncle was one of the homicide victims and Mr. Valdez was able to provide the uncle's last name [*id.* at SOF15, SOF16].[7]  The Court concludes that these facts support a finding of probable cause that Plaintiff had committed either a robbery or an attempted robbery.  The officers had probable cause to believe that

---

[6] Defendants argue that Plaintiff was properly detained on suspicion of robbery.  [#146 at 12; *see also* #99-2 at 00:22-00:28]  The elements of the crime of robbery under Colorado law are: "'(1) that the defendant (2) in the State of Colorado (3) knowingly (4) took anything of value (5) from the person or presence of [a] victim (6) by the use of force, threats, or intimidation.'"  *Anderson-Bey v. Zavaras*, 641 F.3d 445, 451 (10th Cir. 2011) (quoting *People v. Borghesi*, 66 P.3d 93, 97 (Colo. 2003)).

[7] There are two other facts that Sergeant Thomas may have known by 1:45 a.m., but the Court does not believe they contribute to probable cause.  First, it was reported that the 18th Street Gang was involved in the shooting.  [*Id.* at SOF7]  But, there is no indication that Plaintiff was involved with the 18th Street Gang, so this fact does not support probable cause.  Second, there was information that the unidentified suspect arrived at the parking lot in a white Lexus with red rims.  [*Id.* at SOF9]  But, as of this point, the officers did not know that Plaintiff drove a white Lexus with red rims.  [*Id.* at SOF10 (indicating that information about Plaintiff owning a Lexus was learned at approximately 1:49 p.m.)]

13

Plaintiff's uncle had committed a robbery and been shot as a result of the robbery.  The officers had probable cause to believe that an unidentified individual was also involved in the robbery and Plaintiff stated that he had been at the car meet with his uncle.  Like the two identified individuals involved in the robbery, Plaintiff was also shot.  Plaintiff was wearing clothes that, while common apparel, matched the clothes of the unidentified individual.  And Plaintiff and his father initially indicated that they only knew the uncle's nickname, but then twenty minutes later Mr. Valdez was able to identify the uncle's name, arguably suggesting that Plaintiff and his father were initially trying to distance Plaintiff from the uncle involved in the robbery.   Based upon the totality of these facts, "a person of reasonable caution [could] have the belief that" Plaintiff was the unidentified individual involved in the robbery."   *Alonso*, 790 F.2d at 1496.  At a minimum, considering the Defendants' assertion of qualified immunity, arguable probable cause existed on these facts. *Kaufman*, 697 F.3d at 1300.

Because probable cause was established by 1:45 a.m., Plaintiff's remaining claims fail.  Sergeant Thomas had information that the 18th Street Gang had been involved in the robbery and this fact, coupled with the probable cause that Plaintiff had committed the robbery, constitutionally justified Sergeant Thomas's decision to remove Plaintiff's shirt and photograph the tattoos—tattoos reflecting Plaintiff's involvement with the 18th Street Gang would strengthen the case against Plaintiff.  *See, e.g.*, *Schmidt v. City of Bella Villa*, 557 F.3d 564, 573-74 (8th Cir. 2009) (no constitutional violation found when an arrestee was required to partially unbutton her jeans and photograph her own normally-concealed tattoo in private, for identification purposes); *Johnson v. Florell*, No. CIV 05-159 RHK/AJB, 2006 WL 3392784, at *5 (D. Minn. Oct. 19, 2006) ("[T]he court finds no inherent

14

constitutional offense in lifting a tee shirt or holding up shirt sleeves to photograph tattoos" following a suspect's arrest.), *report and recommendation adopted*, 2006 WL 3398051 (D. Minn. Nov. 21, 2006), *aff'd*, 292 F. App'x 523 (8th Cir. 2008).  Similarly, by 1:45 a.m., Sergeant Thomas could lawfully arrest Plaintiff for the robbery, and it was therefore not unconstitutional for her to require Plaintiff to report to the police station after his hospital discharge.  At the police station, Plaintiff could be questioned, booked and fingerprinted, and officers could swab Plaintiff's hands for gunpowder residue.  *Maryland v. King*, 569 U.S. 435, 461 (2013) ("[C]ourts have confirmed that the Fourth Amendment allows police to take certain routine administrative steps incident to arrest—*i.e.*, . . . book[ing], photograph[ing], and fingerprint[ing]." (quotation omitted)); *United States v. Johnson*, 445 F.3d 793, 795-96 (5th Cir. 2006) ("Because the presence of gun powder on [the suspect's] hands was relevant evidence that [the suspect] (or merely time) could have eventually removed or destroyed, if his arrest was valid, the performance of the gun powder residue test was lawful."); *United States v. Simmons*, 380 F. App'x 323, 330 (4th Cir. 2010) (same).  And the Court does not find that the seven-hour delay between Plaintiff's arrest and his release violated Plaintiff's constitutional rights.   *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (holding that a jurisdiction that provides a judicial determination of probable cause within 48 hours of arrest will generally comply with constitutional requirements, unless the delay was unreasonable, such as being motivated by ill will or delay for delay's sake).

Thus, the undisputed evidence demonstrates that Defendants did not violate Plaintiff's constitutional rights.  As a result, Defendants are entitled to qualified immunity and the Motion is GRANTED as to Plaintiff's Section 1983 claims.

15

### C.    Claims under the Colorado Constitution and ELEIA

Claim Six seeks relief against all Defendants under ELEIA for violation of Plaintiff's rights under the Colorado Bill of Rights.  [#99 at 54-55]  As this is Plaintiff's remaining claim, the Court must decide whether to exercise supplemental jurisdiction over it.

A district court has discretion in deciding whether to exercise supplemental jurisdiction.  *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).  The Tenth Circuit has explained:

> Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid ex rel. Enid City Comm'n,* 149 F.3d 1151, 1156 (10th Cir.1998).

*Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).  The refusal to exercise supplemental jurisdiction is especially apt where the interest of comity—leaving to the states to decide novel questions of state law—is present.  *Birdwell v. Glanz*, 790 F. App'x 962, 964 (10th Cir. 2020).

With these principles in mind, the Court turns to Plaintiff's ELEIA claim.  ELEIA creates a cause of action for individuals whose rights under Article II of the Colorado Constitution have been violated by a peace officer.  Colo. Rev. Stat. § 13-21-131.  ELEIA specifically states that "[q]ualified immunity is not a defense to liability pursuant to this section."  Colo. Rev. Stat. § 13-21-131(1)(b).

"Colorado courts look to Section 1983 to interpret ELEIA." *Lucero v. City of Aurora*, 2025 WL 661639, at *9 (D. Colo. Feb. 28, 2025) (citing *Woodall v. Godfrey*, 553 P.3d 249, 256 (Colo. App. 2024)).  Nonetheless, the Colorado Supreme Court has noted that "despite the substantial similarity between article II, section 7 and the Fourth Amendment,

16

[the Colorado Supreme Court is] not bound by the United States Supreme Court's interpretation of the Fourth Amendment when determining the scope of state constitutional protections." *People v. McKnight*, 446 P.3d 397, 406 (Colo. 2019). And, indeed, in some respects, the Colorado Supreme Court has found that the Colorado Constitution provides broader privacy protections than the United States Constitution. *Id.* at 406-10.

ELEIA is relatively new, and courts have had limited opportunities to interpret its provisions. And unlike Section 1983, qualified immunity is not a defense to an ELEIA claim. Moreover, as explained above, the Colorado Constitution may offer broader protections to Plaintiff's privacy interests than United States Constitution offers. Under these circumstances, comity demands that Colorado courts be given the opportunity to interpret the scope of the Colorado Constitution's protections, and the scope of ELEIA. As a result, the Court declines supplemental jurisdiction over Plaintiff's ELEIA claim. That claim is thus DISMISSED WITHOUT PREJUDICE. *Birdwell*, 790 F. App'x at 964 (indicating that state law claims should be dismissed without prejudice if supplemental jurisdiction is declined).

## IV.    Conclusion

For the reasons stated herein, Defendants' Motion for Summary Judgment [#146] is **GRANTED** with respect to Plaintiff's federal claims. The Court **DECLINES** to exercise supplemental jurisdiction over Plaintiff's ELEIA claim and that claim is **DISMISSED WITHOUT PREJUDICE**.

DATED: June 2, 2025                    BY THE COURT:

                                       s/Scott T. Varholak
                                       Chief United Stated Magistrate Judge

17